OPINION
Defendant-appellant Dwayne Bulls appeals the Mahoning County Common Pleas Court's denial of his motion to suppress evidence. For the following reasons, the trial court's judgment is reversed, and the cause is remanded with instructions to suppress the unlawfully seized evidence.
 STATEMENT OF FACTS
On October 8, 1996, Mahoning County Sheriff's Deputy Dishman ran the license plate on appellant's Pontiac and noticed that the plate had expired on October 2. He also discovered that the plate was registered to a Cadillac owned by appellant. Thus, the deputy initiated a traffic stop. Appellant showed the deputy a valid temporary tag for the Pontiac which he had recently purchased. Nonetheless, appellant was ticketed for the improper license plate display in violation of R.C. 4549.08 (C). Appellant produced his driver's license when asked. The deputy testified that appellant stated that he did not yet purchase insurance for the Pontiac. Deputy Dishman decided to impound appellant's car. While waiting for a tow truck, Deputy Dishman conducted an inventory search along with two other deputies that he had called for backup.
Deputies Dishman and Gore testified that appellant kept asking for his key chain which was a black leather pouch hanging from the keys in the ignition. Before handing this pouch to appellant, Deputy Gore opened it and found eleven or twelve rocks of crack cocaine. Appellant was arrested and thereafter indicted for fourth degree felony possession of crack cocaine in violation of R.C. 2925.11 (A), (C) (4) (b).
Appellant filed a motion to suppress in November 1997. After the April 13, 1998 suppression hearing, the court denied the motion on the basis that the deputy was entitled to open the black pouch for his own safety as it could have contained a weapon. A supplemental suppression hearing was conducted on July 6, 1998 where appellant's insurance agent testified that appellant had valid insurance on the date of his arrest. The motion to suppress was again denied on the grounds that merely because appellant's insurance policy covered his newly purchased vehicle does not prove that appellant knew he had insurance or showed proof of insurance.
Following his unsuccessful attempt at suppression, appellant pled to the drug offense and was sentenced to twelve months in prison. He was granted judicial release after serving three months and was sentenced to two years of community control. The within timely appeal followed.
 ASSIGNMENT OF ERROR NUMBER ONE
Appellant sets forth five assignments of error, the first of which contends:
 "ANY AND ALL REASONABLE SUSPICION OR PROBABLE CAUSE TO FURTHER DETAIN OR ARREST DEFENDANT-APPELLANT DISSIPATED AFTER HE PRODUCED A VALID TEMPORARY LICENSE TAG AND PROVIDED A LAWFUL EXPLANATION REGARDING THE REAR DISPLAY OF THE METAL LICENSE PLATE REGISTERED TO ANOTHER CAR WHICH HE OWNED."
Appellant claims that even if the deputy lawfully stopped his vehicle, the legality of the stop disappeared after the officer determined that appellant did not violate any law. First, appellant argues that once he explained to the deputy why he had the license plate for his old car on his new car, the officer should have sent him on his way. Appellant next contends that once he showed the deputy his temporary tag, any problem with the old license plate was nullified. Appellant thus claims that the officer had no right to ask for his license, registration and proof of insurance.
According to R.C. 4549.08, it is unlawful to display a license plate on one car that is registered to another car. An exception exists where an owner who has applied to transfer registration puts the plate from his old and sold car on his new car during the thirty day transition period. R.C. 4549.08 (C) and 4503.12 (C). Appellant admitted on the stand that he did not apply to transfer his registration because the car lot had not yet given him the title to the Pontiac. (Tr. 84). Thus, appellant chose the temporary tag option instead of the registration transfer option. See R.C. 4503.182 (A). Moreover, appellant's old plates were expired, and registration can only be transferred prior to the expiration of the old plates. R.C. 4503.12 (C).
Appellant cites State v. Chatton (1984), 11 Ohio St.3d 59, for the proposition that once a valid temporary tag is produced, reasonable suspicion dissipates and the police officer may not further detain the driver. However, that case is inapplicable and distinguishable. First of all, Chatton was decided prior to the change in the law which requires temporary tags to be displayed in plain view. Id. at 60; R.C. 4503.21. Furthermore, in Chatton,
the driver was not improperly displaying metal plates from a different car as was appellant. Id. at 63.
Even with the valid temporary tag, appellant still violated R.C. 4549.08 (C) since he displayed a plate which was registered to another car without having applied to transfer the registration. The unlawful display was not cured by the production of a valid temporary tag. As such, the deputy was permitted to ask appellant for his license, registration and proof of insurance before writing the ticket for violating R.C. 4549.08 (C). In accordance, this assignment of error is overruled.
 ASSIGNMENTS OF ERROR NUMBERS TWO AND FIVE
Appellant's second and fifth assignments of error, which will be discussed together, contend:
 "ASSUMING ARGUENDO THAT DEFENDANT-APPELLANT VIOLATED STATUTES REGARDING PROPER DISPLAY OF LICENSE PLATES SO THAT THE OFFICER WAS JUSTIFIED IN FURTHER DETAINING HIM, WHEN HE PROVIDED A VALID LICENSE, REGISTRATION, TEMPORARY TAG, BILL OF SALE AND PROOF OF INSURANCE, THERE WAS NO BASIS FOR IMPOUNDING HIS CAR OR PERFORMING AN INVENTORY SEARCH, SO THAT THE RESULTING EVIDENCE GATHERED IS INADMISSIBLE UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 "THE TRIAL COURT IMPOSED AN UNREASONABLE LEVEL OF PROOF ON DEFENDANT-APPELLANT BY REQUIRING HIM TO PROVE THAT HE SHOWED INSURANCE INFORMATION TO THE OFFICER ON THE DATE OF HIS ARREST."
Appellant argues that, since he showed proof of insurance, the police were not entitled to impound his car. Appellant claims that Deputy Dishman's testimony was not credible. Deputy Dishman's report stated that appellant failed to show proof of insurance. At the suppression hearing, appellant testified that he showed proof of insurance in the form of a receipt from his insurance company. Deputy Dishman, however, testified that appellant told him that he had not yet purchased insurance on the Pontiac. (Tr. 42, 50). At the supplemental suppression hearing in front of a different judge, appellant's insurance agent testified that appellant bought insurance on September 11, 1996 and transferred the insurance to the Pontiac on October 10, 1996. Although appellant was pulled over on October 8, the agent testified that the insurance on appellant's old car covered the Pontiac for thirty days after the date of purchase.
Appellant thus argues that it is against the weight of the evidence to believe that he would say that he had no insurance when in fact he did. The state counters that it is plausible that appellant did not know that the insurance policy on his old car would cover his new car for thirty days, especially viewing the insurance paperwork which demonstrates that appellant amended his policy to cover the Pontiac two days after he was arrested.
At a suppression hearing, questions of witness credibility and weight of the evidence are primarily the domain of the trier of fact. State v. Mills (1992), 62 Ohio St.3d 357, 366; State v.Fanning (1982), 1 Ohio St.3d 19, 20. See, also, State v. DeHass
(1967), 10 Ohio St.2d 230. Therefore, appellate courts normally defer to the findings of trial courts on these questions. Where there are two reasonable views in construing evidence presented at a suppression hearing, the appellate court does not choose which view it prefers, but yields to the trial court's determination.State v. Robinette (1997), 80 Ohio St.3d 234, 249 (Cook, J., concurring).
In the case at bar, the trial court occupied the best vantage point from which to evaluate the gestures, voice inflections and demeanor of the witnesses. See Seasons Coal Co., Inc. v. Cleveland
(1984), 10 Ohio St.3d 77, 80. The court believed the testimony of the deputy that appellant failed to show proof of insurance and in fact stated that he did not yet transfer his insurance to his new car. Likewise, the court disbelieved the testimony of appellant that he showed the deputy a receipt showing payment of the first month of insurance.
Appellant complains that the only way he could satisfy the court would be to produce a videotape of himself showing the deputy his proof of insurance. The state points out that appellant could have produced the testimony of his companions who were in the car with him at the time of the traffic stop and he could have placed into evidence the receipt that he allegedly showed the officer.
As aforementioned, whether appellant showed proof of insurance is a matter of credibility. Contradictory testimony was presented. The trial court's decision involved a judgment on who was telling the truth. If an officer is lying, then, yes, it is extremely difficult for a defendant to prove that he showed proof of insurance. However, the law has long left such a decision to the trial court who is in the best position to determine credibility. Apparently, the court found Deputy Dishman to be more credible than appellant. We cannot say that the evidence did not support the trial court's decision with regards to credibility.
Furthermore, regardless of the issue of insurance, the deputy was permitted to impound the vehicle due to the improper display of plates. The license plate law which appellant violated is actually a misdemeanor of the fourth degree. R.C. 4549.08 (C) and R.C. 4549.99 (D). Appellant testified that he could not remove the plates because he did not have a special six point screwdriver. The deputy had the discretion to allow appellant to drive away on a promise that he will remove the plates when he obtains the proper tool. However, a deputy need not be so generous. A driver that is operating a vehicle with an illegal flaw that cannot be rectified on the scene may be prohibited from further driving the vehicle. In these scenarios, impound is permissible. As such, these assignments of error are overruled.
 ASSIGNMENT OF ERROR NUMBER THREE
Appellant's third assignment provides:
 "EVEN IF DEFENDANT-APPELLANT DID NOT PRODUCE PROOF OF INSURANCE, THE SEARCH OF THE CLOSED LEATHER KEY-CHAIN BAG WAS CLEARLY BEYOND THE SCOPE OF A PERMISSIBLE INVENTORY SEARCH AND WAS ALSO NOT PERMITTED UNDER THE `PROTECTIVE SEARCH' EXCEPTION BECAUSE THERE WAS NO BASIS FOR OFFICERS TO REASONABLY BELIEVE HE WAS ARMED AND DANGEROUS."
Appellant argues that the police were not permitted to open his leather bag as part of the inventory search. The state counters that the search of the bag was part of the routine inventory taken prior to impoundment.
An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment. State v. Mesa (1999),87 Ohio St.3d 105, 108. Police may conduct an inventory search of a vehicle that is going to be impounded. State v. Peagler (1996),76 Ohio St.3d 496, 501, citing Colorado v. Bertine (1987),479 U.S. 367, 372-373. Such an inventory protects an owner's property while it is in police custody, protects the police against claims of damaged, lost or stolen property and minimizes danger to police and others. Id. However, an inventory search must be conducted in good faith and in accordance with a reasonable standardized procedure or established routine. State v. Hathman (1992),65 Ohio St.3d 403, 407.
With regards to opening closed containers while inventorying a vehicle subject to impound, the Supreme Court has explained:
 "If, during a valid inventory search of a lawfully impounded vehicle, a law-enforcement official discovers a closed container, the container may only be opened as part of the inventory process if there is in existence a standardized policy or practice specifically governing the opening of such containers.
* * *
 the existence of a reasonable policy or procedure governing inventory searches in general is insufficient to justify the opening of closed containers encountered during the inventory search. Rather some articulated policy must also exist which regulates the opening of containers found during the authorized inventory search." Mesa, 87 Ohio St.3d at 109-110, quoting Hathman, 65 Ohio St.3d at 407-408.
In Hathman, the Ohio State Highway Patrol conducted an inventory search on a car after arresting the defendant. During the inventory, an officer found a plastic bag containing smaller bags and a pill bottle. These "containers" were opened and found to contain contraband. The Supreme Court of Ohio suppressed the contraband because, although evidence was presented that the Highway Patrol had a general policy concerning inventory searches, no evidence was presented that it had an articulated policy specifically regarding the opening of closed containers. Id.
See, also, Florida v. Wells (1990), 495 U.S. 1, 4-5 (suppressing marijuana which was found in a suitcase where the police department had no policy on opening closed containers during inventory searches); Bertine, 479 U.S. at 374 (holding that a backpack and containers within it were lawfully searched during a car inventory where the police department had a specific policy that mandated the opening of closed containers).
In the case at bar, appellant's suppression motion specifically contended that the Mahoning County Sheriff's Office lacked a policy regarding the opening of closed containers that are discovered during an inventory search. This argument was not rebutted as the state failed to put on any evidence regarding this issue. See Hathman, 65 Ohio St.3d at 408 (holding that "there is no evidence" of any standardized policy or practice governing the opening of closed containers). See, also, Wells, 495 U.S. at 1636
(Brennan, J., concurring) (stating that the state did not point to any standardized policy or offer any relevant evidence at the suppression hearing). The state could have submitted a policy manual. See Peagler, 76 Ohio St.3d at 503. The state also could have had the deputies testify about the existence of inventory procedures at the Sheriff's Department. See Mesa,87 Ohio St.3d at 110; Hathman, 65 Ohio St.3d at 404.
Accordingly, absent evidence of a relevant inventory procedure as mandated by Hathman, the opening of the small black pouch hanging from appellant's key chain was not a valid part of the inventory search. Moreover, we must point out that since the deputy was giving the pouch to appellant after the inventory search which did not cover the pouch, it was not actually part of the car's inventory.
Nonetheless, the grounds given by the trial court for denying appellant's suppression motion were not that the deputies were permitted to open the black pouch during the inventory search. Thus, our inquiry does not end here. The grounds stated by the court were that appellant asked for his key chain and that the deputy was permitted to search the bag to protect himself from any deadly weapon which could be concealed within the bag. This leads into appellant's next assignment of error.
 ASSIGNMENT OF ERROR NUMBER FOUR
Appellant's fourth assignment of error alleges:
 "EVEN ASSUMING ARGUENDO THAT A PROTECTIVE SEARCH WAS SOMEHOW WARRANTED UNDER TERRY, THE OFFICER COULD NOT HAVE REASONABLY BELIEVED THAT WHAT HE FELT IN THE SMALL LEATHER BAG WAS A WEAPON AND BECAUSE HE DID NOT RECOGNIZE IT AS CONTRABAND, NO BASIS EXISTED FOR HIM TO OPEN THE BAG UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
In this and the preceding assignment, appellant advances the argument that the search of his key chain pouch was not permitted as part of a protective search because the officers had no reasonable belief that he was armed. Hence, appellant contends that Deputy Gore was not entitled to conduct a "pat down" of the black pouch in order to determine whether a weapon was contained therein. In the alternative, appellant argues that Deputy Gore was not entitled to open the pouch after merely feeling something hard. The state was apparently so confident that a valid inventory search was conducted that it does not even attempt to argue on appeal that the black pouch was lawfully searched under the pat down and/or plain feel exception to the warrant requirement.
Besides the inventory search, there are other exceptions to the warrant requirement of the Fourth Amendment. For instance, upon stopping a vehicle, an officer may conduct a cursory search of the passenger compartment for weapons if he reasonably believes that the suspect is armed and dangerous and may gain immediate control of a weapon. State v. Bobo (1988), 37 Ohio St.3d 177,180. Furthermore, an officer can pat a suspect down if this same reasonable belief exists. A pat down was first permitted in Terryv. Ohio (1968), 392 U.S. 1, where the United States Supreme Court held that during a valid investigatory stop, a police officer may conduct a protective search of a detainee's outer clothing by patting him down if the officer reasonably concludes that the detainee is armed and dangerous. Id. at 24.
Appellant claims that there was no reason to believe he was armed and dangerous so the deputy had no reason to conduct a pat down on the pouch. Even assuming there was a lack of testimony on reasonable suspicion that appellant was armed, two deputies testified that appellant asked for his key chain more than once. Appellant states that he did not ask for his key chain because he did not know that his car was being impounded until after the black pouch was opened and drugs were allegedly discovered. Once again, credibility is a matter for the trial court. The decision to believe that appellant asked for his key chain is not unreasonable. Thus, we proceed on the basis that appellant did so ask. Taking the trial court's findings of fact as true, appellant asked for his key chain with the black pouch, and Deputy Gore decided to grant appellant's request. In order to give appellant his keys, Deputy Gore had to touch the pouch. As such, appellant basically consented to the deputy's touching the pouch and any subsequent plain feel of contraband.
Regarding the issue of plain feel, it has been held that if the officer feels a weapon, he may seize the weapon and charge the detainee. Id. If the officer knows from his sense of touch that an object felt during a pat down is not a weapon, he may not further manipulate the object to ascertain its identity.Minnesota v. Dickerson (1993), 508 U.S. 366.; State v. Evans
(1993), 67 Ohio St.3d 405, 414. If from the officer's cursory feel of the object it is immediately apparent that the object is contraband, then the officer may remove the object. Dickerson,508 U.S. at 376. Since Deputy Gore did not testify that he thought the hard object in the pouch was crack, we need not further discuss the "immediately apparent" analysis set forth inDickerson.
A question arises when the officer is unable to determine from plain feel whether an object is a weapon. Evans,67 Ohio St.3d at 414. The court must ask whether the officer reasonably believed, based upon the size and density of the object, that the object could be a weapon. Id. Note that absent such a reasonable belief, the pouch could not be opened as this is not the case of a search incident to arrest. The Supreme Court of Ohio has specifically held:
 "* * * Terry does not require that the officer be absolutely convinced that the object he feels is a weapon before grounds exist to remove the object. At the same time, a hunch or inarticulable suspicion that the object is a weapon of some sort will not provide a sufficient basis to uphold a further intrusion * * *.
 If the object felt is hard, then the question is whether its `size or density' is such that it might be a weapon. But because `weapons are not always of an easily discernible shape,' it is not inevitably essential that the officer feel the outline of a pistol of something of that nature. Somewhat more leeway must be allowed upon `the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing,' which is most likely to occur when the suspect is wearing heavy clothing." Id. at 415.
In Evans, the officer testified that upon patting the defendant down, he felt a "large bulk" and a "rock substance" in the defendant's pocket. The officer stated that because knives come in all shapes and sizes, he could not discern whether he felt a knife. Id. The object felt by the officer turned out to be $1000 with crack on top. The court characterized the crack and $1000 seized from the defendant's pocket as a large bulk and a large wad. The Supreme Court upheld the seizure emphasizing that the officer was unable to conclude that the object was not a knife. Id. at 415-416.
Appellant disputes that the rocks of crack in this case could feel like a weapon. He points out that the black pouch attached to his key chain measures four inches long by two and three-quarter inches high. The pouch has two zipper compartments and a snap compartment. One of the zipper compartments contains 5 small key rings on a metal support. Since the ignition key was hanging from the key ring, the contents of this compartment would be exposed. The crack was allegedly discovered in the other zipper compartment.
Both deputies testified that the black pouch was big enough to contain a deadly weapon. (Tr. 55, 60). However, the fact that a pocket or purse or pouch is large enough to conceal a weapon does not provide a reasonable belief that a weapon is contained therein. See Id. at 416 (where the court stated that a search and seizure is not reasonable merely because a weapon could be contained therein, pointing out that a razor blade could be contained virtually anywhere and holding that a search on such grounds would be overly intrusive).
The state failed to elicit sufficient evidence on direct examination regarding why Deputy Gore opened the pouch or what he felt. (Tr. 57-60). Although defense counsel unwittingly elicited some testimony from Deputy Gore that could be construed as an expression of his concern about a weapon (Tr. at 71), we hold that any concern that the crack was a weapon was unreasonable.
Deputy Gore testified that before handing appellant his key chain, he felt a "hard substance." (Tr. 70). The case at hand is distinguishable from Evans because there was not a large bulk felt in appellant's pouch. Eleven rocks of crack weighing three and one half grams is hardly large, bulky or substantial. The size, density and shape of eleven rocks of crack cannot lead an officer to reasonably believe that a weapon is present. Furthermore, the pouch which allegedly contained the crack is relatively thin and as such, would not distort the contours of rocks of crack as a person's heavy layers of clothes may. For the foregoing reasons, this court must conclude that the officer did not reasonably believe that the rocks of crack felt like a weapon. Although it may have been immediately apparent that the rocks of crack were just that, there is no testimony to that effect.
For the foregoing reasons, the judgment of the trial court is hereby reversed and this cause is remanded to the trial court with instructions to suppress the unlawfully seized evidence.
Cox, P.J., concurs, Waite, J., concurs.
 _________________________ JOSEPH J. VUKOVICH, JUDGE